UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
LESLEY TOUSSAINT, #02-A-3882

                            Petitioner,
        -against-


THE PEOPLE OF THE STATE OF NEW YORK,

                            Respondent.
-------------------------------------------------------------X
FEUERSTEIN, District Judge:

**FILED**
**CLERK**

6/5/2015 3:41 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**OPINION AND ORDER**
**12-CV-0357 (SJF)**

Before the Court is Lesley Toussaint's ("petitioner") petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254. The government has opposed the petition. For the following

reasons, the petition for a writ is **DENIED** and this proceeding is dismissed.

## I.    Introduction

A judgment of conviction was entered against petitioner in the County Court, Suffolk

County, New York, upon a jury verdict finding petitioner guilty of murder in the first degree

(counts one (1), two (2), and three (3)); murder in the second degree (counts four (4) and five

(5)); robbery in the first degree (counts six (6) and seven (7)); robbery in the second degree

(counts eight (8), nine (9) and eleven (11)); and arson (count ten (10)). Petitioner was sentenced

to life without parole for counts one (1), two (2) and three (3); an indeterminate term of twenty-

five (25) years-to-life on counts four (4), five (5) and six (6); a determinate term of twenty-five

years on counts seven (7) and ten (10); and a determinate term of fifteen (15) years on counts

eight (8), nine (9) and eleven (11). The sentences on counts two (2) and three (3) were to run

consecutively with each other, but concurrently with count one (1), while counts four (4) and five

(5) were to run consecutively with each other and concurrently with counts one (1), two (2) and

three (3). The sentences on counts six (6) and seven (7) were to run consecutively with each other, but concurrently with counts one (1) through five (5), while counts eight (8) and nine (9) were to run consecutively with each other, but concurrently with counts one (1) to seven (7). Counts ten (10) and eleven (11) were to run consecutively with all other counts.

## II.     Background

### A.     Facts[1]

#### 1.     The Trial

At a trial held before the Honorable Gary Weber, County Court, Suffolk County, New York in May 2002, government witness Roger Boigris ("Boigris") testified that he resided at 5 Hemlock Street, Central Islip, New York. Boigras' cousin, Philippe Behrmann ("Behrmann") and Behrmann's girlfriend, Dorothy Thomas ("Thomas"), resided next door at 3 Hemlock Street in a basement apartment. Tr. 170-71, 268. Behrmann was employed by BJ's Wholesale Club, where he had befriended petitioner. Tr. 174, 210.

In September 1999, Behrmann received an insurance settlement check in the sum of eight-thousand dollars ($8,000), which Behrmann cashed in the presence of Boigris and concealed in a small can inside a radio located on his nightstand. Tr. 174-77. Boigris testified that most of Behrmann's neighborhood friends were aware of these funds. Tr. 229.

Sometime between September 1999 and before December 1999, petitioner resided in Behrmann's apartment for approximately one (1) month; when petitioner moved out, his cousin Ricardo Joseph ("Joseph") packed petitioner's belongings and removed them from Behrmann's apartment. Tr. 179, 210.

---

[1] The facts are from the trial transcript ("Tr").

On February 24, 2000, between 3:00 and 3:30 p.m., Boigris saw Behrmann, Joseph and petitioner returning from a neighbor's house across the street, where the men had been drinking beer, to Behrmann's apartment.  Tr. 182.  While in the apartment, Behrmann and petitioner argued over a past trip to Atlantic City, New Jersey.  Tr. 182-83. When petitioner and Joseph left the apartment to go outside, Boigras followed and heard petitioner state, "I can't wait."  Tr. 183-84.  When Boigras asked what he had meant, petitioner stated, "Nothing."  Tr. 184.  Behrmann and his girlfriend Thomas, whose two (2) children were also present, continued to drink beer while Boigras, petitioner and Joseph remained sober.  Tr. 184-86.  Boigras left Behrmann's residence around 7:00 p.m. and went to bed at approximately 11:30 p.m.  Tr. 185-86, 188.

Petitioner's sister and co-defendant, Paulene Toussaint ("Paulene"), testified[2] that on February 24, 2000 and at petitioner's request, she and her boyfriend, co-defendant Andrew Grant ("Grant"), arrived at Behrmann's house at approximately 9:55 p.m.  Tr. 553–55.  When they arrived, Paulene observed that petitioner, Joseph, Behrmann, Thomas and her two (2) children and petitioner's girlfriend, Angelica Heard ("Heard"), were present at Behrmann's apartment.  Tr. 552, 557-58.  There was loud music playing from the back bedroom and petitioner, Joseph, Berhmann and Thomas were drinking beer and hard liquor; Joseph and Behrmann appeared to be intoxicated according to Paulene.  Tr. 563-65.

At sometime after 11:00 p.m., petitioner helped Behrmann, who had continued to drink, walk down to the hall to the back bedroom while Thomas, Heard, Joseph and Paulene remained

---

[2]  Pursuant to a cooperation agreement with the government Toussaint pled guilty to two (2) counts of attempted robbery in the first degree and agreed to cooperate with law enforcement against her four (4) co-defendants, i.e., petitioner, Ricardo Joseph, Anderson Grant and Angelica Heard.  Tr. 545-46.

in the kitchen. Tr. 568. After Thomas went into the bedroom, petitioner told Paulene, Heard and Joseph that Behrmann owed him money and that he had planned to drug him, but it was unnecessary since Behrmann was intoxicated. Tr. 568-69. Petitioner then returned to the bedroom with Joseph, while Paulene stayed by the table with Grant and Heard stayed by the couch. Tr. 570. Petitioner emerged from the bedroom with Joseph and Thomas; Thomas came to the table, but then went back down the hallway and into the bathroom, where she closed the door. Tr. 571-72. Petitioner motioned for Joseph to turn off the lights in the kitchen area; Joseph went by the door and stood next to the light switch while petitioner stood near the kitchen sink. Tr. 572-73. Joseph turned off the light[3] as Thomas emerged from the bathroom and walked towards the kitchen, when petitioner put his left hand across her neck, while Joseph turned the lights back on. Tr. 573-75. Paulene testified that petitioner, at five (5) feet, seven (7) inches tall, was taller than Thomas and her feet lightly touched the floor while she grabbed at petitioner's forearm. Tr. 575-76. Petitioner kept Thomas in a choke hold and held her there while she kept her hands on his arm, making choking sounds. Tr. 576-77. No one said anything to petitioner as he continued holding onto Thomas and when he let her go, she fell to the floor where she remained motionless and appeared unconscious. Tr. 577. When Heard and Paulene asked petitioner what he was doing, he told them to relax and went into the bedroom; Joseph followed him. Tr. 579. Petitioner and Joseph brought Behrmann, who was wearing pants, out of the bedroom and slapped him a couple of times saying, "Wake up." Tr. 580. With one person on either side of Behrmann, whose hands appeared to be tied behind his back, petitioner and Joseph brought him from the bedroom into the kitchen and asked about the location of the money. Tr.

---

[3] Paulene testified that the area was lit by a light from the back bedroom. Tr. 574.

581, 589-591. Behrmann, who was in a kneeling position with his hands around his back, called out for Thomas while petitioner, Joseph and Grant hit and kicked him with their legs and hands and petitioner lit Behrmann's dread locks on fire with a lighter. Tr. 592-94. Behrmann continued calling out for Thomas and refused to tell them where the money was while the three (3) men continued hitting him. Tr. 594-95. At some point during the scuffle, Paulene noticed that Thomas had moved while laying on the floor, which Paulene reported to petitioner. Tr. 591.

After a few minutes, petitioner and Joseph took Behrmann from the kitchen area back to the bedroom; Grant followed them. Tr. 596. Joseph came out of the bedroom carrying a sheet or some type of cloth, which he used to tie Thomas' arm across her neck, and began punching and kicking her face, head and stomach. Tr. 597-598. Joseph returned to the back bedroom followed by Paulene, who wanted to speak to Grant, but Grant was busy looking for the money. Tr. 598-99. Heard then called out, "I think she's dead," in reference to Thomas; petitioner checked her pulse and breathing and announced that she was dead. Tr. 600. Based upon petitioner's instructions, Paulene went into the bathroom and began filling the tub with water and then went to the kitchen to assist Heard in cleaning up Thomas' bodily fluids. Tr. 601-02. Joseph, Paulene and Heard removed Thomas' clothes and placed her in the tub. 615-16.

Paulene, Grant and Joseph searched the apartment for the money. Tr. 603-04. Paulene went back into the bedroom where she observed Behrmann laying on his back across the bed while petitioner, who was kneeling behind Behrmann, held an extension cord on Behrmann's neck. Tr. 604-605. As petitioner asked Behrmann about the location of the money, he would loosen the cord to allow Behrmann to answer and after Behrmann refused to tell him, petitioner would tighten the cord. Tr. 604. As petitioner tightened the cord, Joseph and Grant held

Behrmann's legs down to prevent him from moving. Tr. 606, 608. After a few minutes, Behrmann had basically stopped moving and petitioner told Joseph and Grant to let him go; Paulene testified that she believed he died at that moment. Tr. 609-10. Joseph then moved Thomas' body from the bathtub and into the bedroom. Tr. 617.

Petitioner instructed Heard and Paulene to assist Joseph and Grant in locating the money; to her knowledge, no money was found. Tr. 611, 613. Petitioner stated that the apartment could not be left as it was and that it would have to be burned. Tr. 619. Heard and Paulene took the bags containing Thomas' clothes and left to go to the train station to return to Brentwood, leaving the three (3) men behind. Tr. 621-622. Joseph and Grant caught up with the women in the station parking lot, then Paulene noticed petitioner running on Lowell Avenue toward some cars and heard a scream from that direction; she observed a vehicle make a three-quarter turn and head toward the train station; driving the stolen vehicle was petitioner and, after Paulene, Heard, Joseph and Grant entered the vehicle, petitioner drove to the Brentwood train station, where the car was recovered on March 8, 2000. Tr. 625-628, 439, 447.

Dunor Mauvais ("Dunor") testified that he, his wife and their three (3) daughters resided on the main floor of 3 Hemlock Street, his brothers occupied the top floor and Behrmann and Thomas lived in the basement. Tr. 268. On February 25, 2000, Dunor, who had fallen asleep while watching television in his living room, woke up because the house felt excessively hot. Tr. 269-70. Dunor looked around, but did not locate the source of the heat until he opened the door leading downstairs and saw flames. Tr. 271-72. Dunor screamed to wake up his wife Helen, who was holding their baby daughter; as soon as Helen gave the baby to Dunor, the fire engulfed their part of the residence. Tr. 272.

Behrmann's cousin Boigras testified that sometime after he had fallen asleep, he was awakened by his wife, who advised him that Behrmann's house was on fire. Boigras dressed and ran outside his front door, where he observed the entire house in flames. Tr. 188-89. Boigras advised a member of the fire department that people lived downstairs, but later learned that Behrmann and Thomas had not survived. Tr. 189-90. At approximately 10:00 a.m. on February 25, 2000, Boigris entered the house to look for the radio, which he found empty and pulled apart into two (2) pieces. Tr. 190-92. Boigris informed a police detective at the scene that Behrmann had used the radio to store the insurance proceeds. Tr. 192.

On May 21, 2002, a jury convicted petitioner of three (3) counts of murder in the first degree, two (2) counts of murder in the second degree, two (2) counts of robbery in the first degree, three (3) counts of robbery in the second degree and arson in the second degree. Answer ("Ans.") (DE 6) ¶ 3. On June 27, 2002, petitioner was sentenced to life without parole on the first degree murder counts, an indeterminate term of 25 years to life on the second degree murder counts and one (1) count of robbery in the first degree, a determinate term of 25 years on one (1) count of robbery in the first degree and the arson count, and determinate terms of fifteen years on the second degree robbery counts. *Id.* at ¶ 4.

## 2.    Post Trial History

On direct appeal to New York's Appellate Division, petitioner argued that: (1) co-defendant Joseph's statements were inadmissable hearsay; (2) petitioner's right to a fair trial was compromised by the trial court's handling of a prospective juror; (3) the jury instructions were improper; (4) ineffective assistance of counsel; (5) the sentence was excessive; and (6) the evidence presented to the grand jury was legally insufficient. The Appellate Division affirmed

the trail court and held that: (1) the court properly declined to admit the co-defendant's two (2) statements as inadmissible hearsay; (2) defendant's contention concerning the discharged prospective juror was speculative and without merit; (3) defendant was not prejudiced by the trial court's charge on accomplice corroboration and the instruction was proper; (4) the trial court properly exercised its discretion in permitting an accomplice witness to be called out of turn; (5) petitioner received effective assistance of counsel; (6) the trial court did not demonstrate bias; (7) the claim that the evidence presented to the grand jury was insufficient for the arson count was not reviewable as the judgment of conviction was based upon legally sufficient evidence; and (8) petitioner's sentence did not indicate that he was punished for asserting his right to trial. The court also held that petitioner's remaining contentions were unpreserved for appellate review. *People v. Toussaint*, 902 N.Y.S.2d 165 (N.Y. App. Div. 2010). On September 17, 2010, the Court of Appeals denied petitioner's application for leave to appeal. *People v. Toussaint*, 935 N.E.2d 826 (N.Y. 2010).

In December 2011, petitioner moved, pursuant to New York Criminal Procedure Law ("CPL") 440.10, to vacate his conviction on the grounds there was no probable cause for his arrest and trial counsel's failure to litigate this issue amounted to ineffective assistance. Ans. ¶ 10. The trial court denied petitioner's motion by decision and order dated January 9, 2011, holding that his contentions were procedurally barred and devoid of merit. *Id.* at ¶ 12. The Appellate Division denied petitioner's application for leave to appeal. Supp. Mem. (DE 16) p. 5.

### B.    Petitioner's Petition for a Writ of Habeas Corpus

The petition alleges the following: (1) the trial court violated petitioner's due process rights by denying petitioner the opportunity to present evidence that a co-defendant twice

confessed to committing the charged crimes; (2) the trial court's refusal to question a discharged prospective juror violated petitioner's sixth amendment right to a fair trial; (3) the trial court committed reversible error by providing the jury with a list of specific evidence to determine whether the accomplice testimony was sufficiently corroborated; (4) the trial court's rulings on objections made by the prosecution during Paulene Toussaint's testimony violated his right to effective cross-examination; (5) the application of CPL § 60:22 to the first and second degree murder charges violated the due process clause; (6) ineffective assistance of trial counsel; (7) the trial court improperly assumed the role of prosecutor and bolstered the credibility of key witnesses; (8) insufficient evidence was presented to the grand jury with regard to the arson count; (9) the sentence imposed was unduly harsh and excessive and punished petitioner for exercising his right to a jury trail; (10) police did not have probable cause to arrest petitioner and thus, his statement should be suppressed; and (11) ineffective assistance of trial counsel for failing to raise the probable cause issue.

## II. Discussion

### A. Legal Standard for a Writ of Habeas Corpus by a Person in State Custody

"In reviewing a state prisoner's habeas corpus petition pursuant to 28 U.S.C. § 2254, a federal district court makes an independent determination as to whether the petitioner is in custody in violation of his rights under the Constitution, or any laws and treaties of the United States." *McCool v. New York State*, 29 F. Supp. 2d 151, 157 (W.D.N.Y. 1998) (citing *Coleman v. Thompson*, 501 U.S. 722, 730 (1991)).

As amended by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"), 28 U.S.C. § 2254(a) provides that a "district court shall

entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  A federal court may grant a writ of habeas corpus to a State prisoner where the federal claim was "adjudicated on the merits" in state court if adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.[4]

28 U.S.C. § 2254(d).

"An 'adjudication on the merits' is a "substantive, rather than a procedural, resolution of a federal claim.' "  *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001)(quoting *Aycox v. Lytle*, 196 F.3d 1174, 1178 (10th Cir. 1999)).  A "state court 'adjudicate[s]' a state prisoner's federal claim on the merits when it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment."  *Id.* (quoting 28 U.S.C. § 2254(d)(1)).  "When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim—even if the state court does not explicitly refer to either the federal claim or to relevant federal case law."  *Id.*

The Second Circuit Court of Appeals expressly adopted the "Fifth Circuit's succinct articulation of the analytic steps that a federal habeas court should follow in determining whether

---

3.  "This standard of review, as opposed to the standard existing prior to the passage of the Antiterrorism and Effective Death Penalty Act (AEDPA) in 1996, is more deferential to state court decisions."  *Garry v. Greiner*, No. 01 Civ. 0848, 2003 WL 21436217, at *2 (S.D.N.Y. June 19, 2003).

a federal claim has been adjudicated 'on the merits' by a state court." *Id.* at 314. In *Mercadel v. Cain*, 179 F.3d 271, 274 (5th Cir. 1999), the court held:

> [W]e determine whether a state court's disposition of a petitioner's claim is on the merits by considering: (1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state court's opinion suggests reliance upon procedural grounds rather than a determination on the merits.

Where a state court has not adjudicated a state prisoner's federal claim on the merits, the " '[the court applies] the pre-AEDPA standards and review[s] *de novo* the state court disposition of the petitioner's federal constitutional claims.' " *Garry v. Greiner*, No. 01 Civ. 0848, 2003 WL 21436217, at *2 (S.D.N.Y. June 19, 2003) (quoting *Cotto v. Herbert*, No. 01 Civ. 2694, 2003 WL 1989700, at *6 (2d Cir. May 1, 2003)).

Title 28 U.S.C. § 2254(e)(1) provides that the "determination of a factual issue made by a State court shall be presumed to be correct" and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

**B.      Petitioner's Application for a Writ Pursuant to 28 U.S.C. § 2254**

**1.      Admission of Petitioner's Co-Defendant's Statements**

Plaintiff claims that the trial court violated his due process rights by refusing to admit into evidence, as a declaration against penal interest, a letter and an affidavit written by co-defendant Joseph wherein he accepts full responsibility for the charged crimes and states that petitioner took no part in them. Pet. p. 5.

"The declaration against penal interest exception to the hearsay rule 'recognizes the

general reliability of such statements . . . because normally people do not make statements damaging to themselves unless they are true." *People v. Shabazz*, 999 N.E.2d 504, 505 (N.Y. 2013) (quoting *People v. Brensic*, 509 N.E. 1226, 1228 (N.Y. 1987)). To satisfy this exception, "(1) the declarant must be unavailable to testify by reason of death, absence from the jurisdiction or refusal to testify on constitutional grounds; (2) the declarant must be aware at the time the statement is made that it is contrary to penal interest; (3) the declarant must have competent knowledge of the underlying facts; and (4) there must be sufficient proof independent of the utterance to assure its reliability." *Id.*

Petitioner claims that the statements should have been admitted because, as a practical matter, Joseph was unavailable to testify and was coerced into renouncing the statement by the prosecution, as his attorney argued during trial (*see* tr. 1177-88). Pet. pp. 6-7.

The trial court held that it could issue a writ to have Joseph brought to court and therefore, he was not unavailable; in addition, the court did not find the statements to be "totally exculpatory." Tr. 1182, 1187. On appeal, New York's Appellate Division affirmed, holding that petitioner failed to establish that the declarant was unavailable to testify at trial and there were no other indications that the statements were trustworthy and reliable. *People v. Toussaint*, 902 N.Y.S.2d 165, 166 (N.Y. App. Div. 2010). The appeals court also noted that Joseph specifically repudiated one of the statements during his plea allocution and that the other statement was not shown to be against his penal interest and was largely exculpatory. *Id.* The Court of Appeals denied leave to appeal. *People v. Toussaint*, 935 N.E.2d 826 (N.Y. 2010).

Based upon the foregoing, petitioner has not demonstrated that the state court's adjudication of the claim resulted in a decision that was contrary to or involved an unreasonable

application of state law or that the decision finding the statements inadmissible was based upon an unreasonable determination of the facts in light of the evidence presented. Accordingly, a writ shall not issue on this ground.

## 2.     The  Discharged Prospective Juror

Examining the prosecution's discovery materials, defense counsel learned that Allen Feeler ("Feeler"), a discharged prospective juror, had looked in the house at 3 Hemlock Street, but failed to mention this fact during voir dire. Voir Dire transcript ("VD Tr.") 371-72. Defense counsel requested that the court recall Feeler, who had been excused, to see if he spoke to any prospective jurors since three (3) jurors had been selected from Feeler's group. VD Tr. 372-73. The government opposed the request, pointing out that Feeler had asked to be excused, there was no indication that he had poisoned the panel and that if the court determined an inquiry was necessary, it could question the actual jurors at the appropriate time.[5]  *Id.*  The trial court held that if defense counsel investigated the matter and could set forth a factual basis to question Feeler, the court would do so; otherwise, it offered to question the three (3) jurors selected from Feeler's group, which defense counsel declined. VD Tr. 375-76. On appeal, the Appellate Division held that petitioner's "contention that the trial court should have questioned a discharged prospective juror whose name was on the 'crime scene log' on the day of the incident is based on speculation and is without merit." *Toussaint*, 902 N.Y.S.2d at 166.

Petitioner claims that the trial court violated his right to a fair and impartial jury by

---

[5]  The court and prosecutor recalled that Feeler was a morgue attendant or a hearse driver; the crime scene log reflected that he recovered Behrmann's and Thomas' bodies. VD Tr. 373-374.

refusing to question Feeler. Petitioner argues that it was not enough to question the jurors and that Feeler should have been questioned by counsel and the court and the failure to do so forced petitioner to go to trial in "front of a jury that already had pre-existing feelings and information about [petitioner] and the case." Pet. pp. 8, 10.

"The handling of possible juror partiality or misconduct 'is entrusted to the sound discretion of the trial court.' " *Lettley v. Walsh*, No. 01 Civ. 5812, 2007 WL 4590019, at *5 (E.D.N.Y. Dec. 20, 2007) (quoting *Fama v. Comm'r of Corr. Servs*, 235, F.3d 804, 813 (2d Cir. 2000)). In determining a § 2254 petition, a state trial court is entitled to a " 'presumption of correctness with respect to its conclusion that the jury was impartial.' " *Id.* (quoting *Fama*, 235 F.3d at 813). "Indeed, the Supreme Court has made it clear that 'the trial court's findings of impartiality [may] be overturned only for 'manifest error.' " *Knapp v. Leonardo*, 46 F.3d 170, 176 (2d Cir. 1995) (quoting *Patton v. Yount*, 467 U.S. 1025, 1031 (1984)). Moreover, "[t]he trial judge has broad discretion in the questioning of potential jurors during voir dire." *Wells v. Ricks*, No. 047 Civ. 6982, 2008 WL 506294, at *34 (S.D.N.Y. Feb. 26, 2008) (citing cases).

In light of the foregoing and the fact that petitioner's counsel made the decision not to further investigate, petitioner is incorrect as he has not demonstrated that the jury was biased or a violation of his sixth amendment rights. Consequently, the state court's decision with respect to Feeler was not contrary to or an unreasonable application of federal law or based upon an unreasonable determination of the facts. For these reasons, petitioner's request for a writ of habeas corpus on this ground is denied.

### 3.    The Trial Court's Jury Instructions on Accomplice Liability

Petitioner contends that the trial court's marshaling of the evidence for the jury's consideration in determining whether the accomplice testimony was corroborated by other evidence in the record gave the jury the impression that the marshaled testimony was credible and reliable and sufficiently connected petitioner to the charged crimes. Pet. p. 11.

Judge Weber instructed the jury that it was required to accept his determination that Paulene Toussaint was an accomplice as a matter of law. Tr. 1423. Judge Weber also instructed that: "A defendant may not be convicted of any offense upon the testimony of an accomplice unsupported by corroborative evidence tending to connect the defendant with the commission of such offense"[6] and explained that the "law views with suspicion the testimony of a witness who's an accomplice in a criminal trial since, by his own testimony, he was a participant in the events charged in the indictment." Tr. 1424. "To be sufficient, such other evidence standing alone must satisfy the jury that it tends to connect the defendant with the commission of a crime in such a way as may reasonably satisfy [the jury] that the accomplice is telling the truth." *Id.*

To meet this test, the jury was instructed that they could consider the following evidence: the testimony of the detective to whom petitioner confessed; testimony of witnesses who saw petitioner at Behrmann's home during the evening of February 24, 2000; testimony of Dunor Mauvais' relatives who stated that shortly after February 25, 2000, petitioner had new clothing and new used cars; Boigras' testimony regarding Berhmann's possession of the insurance proceeds while petitioner lived at his apartment; and the testimony of the witnesses whose car

---

[6]  N.Y. Crim. Proc. § 60.22(1) (McKinney 2015).

petitioner stole.  Tr. 1425.

On direct appeal, the appellate division denied petitioner's claim on this issue, holding that "the trial court's marshaling of possible corroborating evidence in its charge on accomplice corroboration did not create an imbalance which prejudiced the [petitioner] or placed undue emphasis on the People's contentions,"and it "served to explain the application of the law to the facts" and thus "viewing the language of the accomplice corroboration charge as a whole, the instruction was proper." *Toussaint*, 902 N.Y.S.2d at 166.

"Before a federal court may overturn a conviction resulting from a state trial in which an erroneous instruction was used, or a properly requested instruction was not given, it must be established not merely that the instruction was erroneous, but that it 'violated some right which was guaranteed to the defendant by the Fourteenth Amendment.' " *Klosin v. Conway*, 501 F. Supp. 2d 429, 437 (W.D.N.Y. 2007) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146 (1973)). With respect to federal law, it is "well established that a federal conviction may be supported 'by the uncorroborated testimony' of even a single accomplice witness 'if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt.' " *United States v. Florez*, 447 F.3d 145, 155 (2d Cir. 2006) (quoting *United States v. Parker*, 903 F.2d 91, 97 (2d Cir. 1990)). Claims arising from New York's CPL § 60.22, however, are "purely an artifact of New York statutory law," *Williams v. Marshall*, No. 09 Civ. 7411, 2011 WL 2175810, at *14 (S.D.N.Y. Mar. 30, 2011), and "federal habeas relief does not lie for errors of state law," *id.* (quoting *Estelle v. McGuire*, 502 U.S. 62, 67 (1991)).  "A federal habeas court is restricted to deciding whether a conviction violated the 'Constitution, laws, or treaties of the United States.' " *Id.* (quoting *Estelle*, 502 U.S. at 68), and consequently, federal habeas relief is unavailable for

this claim.[7]  Because petitioner's claim is based on state law, he has not alleged a violation of the federal constitution or laws and accordingly, this claim is denied.

### 4.        Testimony of Paulene Toussaint

Petitioner contends that the trial court aided the prosecution by improperly allowing Paulene Toussaint to testify out of turn, made erroneous evidentiary rulings and interfered with defense counsel's cross-examination, all of which deprived him of a fair trial.  Pet. pp. 16-20. The Appellate Division held that the trial court did not "improvidently exercise its discretion in permitting the accomplice witness to be called out of turn, or in denying the defense counsel's request for an adjournment prior to the completion of the cross-examination of that witness." *Toussaint*, 902 N.Y.S.2d at 166.

"Reversal based on inappropriate judicial participation is warranted only when such conduct 'destroy[s] the impartial, judicious, and, above all, responsible . . . courtroom atmosphere in which guilt or innocence [must] be soberly and fairly tested.' " *Miller v. Walker*, 413 F. Supp. 2d 251, 258 (W.D.N.Y. 2006) (quoting *United States v. Nazzaro*, 472 F.2d 302, 309-11 (2d Cir. 1973)) (reversing conviction based upon trial judge's "vigorous participation in examining" defendant and defense witnesses "contrasted with the relative freedom from hostile interruption of the prosecution's witnesses" and holding that such conduct "could not avoid conveying to the jury that the judge did not believe [defendant] and the other defense witnesses").  The trial court did not cross the line "separating permissible and impermissible

---

[7]  As the court in *Williams* pointed out, petitioner cannot avoid this rule by couching his claim as one brought under the due process clause because it "is well established that in federal court a conviction can stand on accomplice testimony alone."  2011 WL 2175810, at *14.

judicial conduct," *Nazzaro*, 472 F.2d at 313, and, accordingly, habeas relief is not warranted on this claim.

### 5. Claim that Application of New York CPL § 60.22(1) Denied Petitioner Due Process

Petitioner alleges that to prove the first degree murder[8] charges in the indictment, the prosecutor was required to prove that petitioner "commanded" a co-defendant to murder Behrmann and Thomas. Pet. pp. 21-22. He argues that allowing "so-called corroborative evidence to merely tend to connect the defendant with the crimes of First degree Murder," permitted the jury to "make a giant leap over the due process clause[]." *Id.* at 22. Petitioner also argues that, based upon the application of CPL § 60.22(1), he was foreclosed from raising an affirmative defense to the second degree murder[9] counts. *Id.* at 22-23. However, as no objection to this jury instruction was raised at trial, the claim was unpreserved for appellate review and is procedurally defaulted unless petitioner can show cause for the default and prejudice.

The Supreme Court has "made clear that, absent a showing of cause and prejudice or a

---

[8] New York Penal Law § 125.27(1)(a)(vii).

[9] New York Penal Law § 125.25(3). This section provides that a person is guilty of second degree murder if, in the course of committing a named crime, he "causes the death of a person other than one of the participants; except that in any prosecution under this subdivision, in which the defendant was not the only participant in the underlying crime, it is an affirmative defense that the defendant: (a) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (b) Was not armed with a deadly weapon, or any instrument, article or substance readily capable of causing death or serious physical injury and of a sort not ordinarily carried in public places by law-abiding persons; and (c) Had no reasonable ground to believe that any other participant was armed with such a weapon, instrument, article or substance; and (d) Had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury. . . .

-18-

fundamental miscarriage of justice, a federal habeas court may not review a federal claim that has been defaulted in state court pursuant to an independent and adequate state procedural ground." *Hemphill v. Senkowski*, No. 02 Civ. 7093, 2004 WL 943567, at *8 (S.D.N.Y. May 3, 2004) (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). As a result, "federal habeas review is precluded 'as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision.' " *Cruz v. Filion*, 456 F. Supp. 2d 474, 481 (S.D.N.Y. 2006) (quoting *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990)).

"Pursuant to New York's contemporaneous objection rule, an objection must be raised at trial to preserve it for appellate review." *Id.* at 480-81 (citing CPL § 470.05(2)). Where an appellate court finds that a claim was unpreserved because trial counsel did not object, the court's dismissal of the claim is based upon on adequate and independent state ground. *See Harris v. Reed,* 489 U.S. 255, 261-62 (1989). When the state court has dismissed a petitioner's federal claim on an adequate and independent state ground, "habeas review of that claim is procedurally barred unless the petitioner can demonstrate either (1) cause for the default and prejudice attributable thereto; or (2) that the failure to consider the federal claim will result in a fundamental miscarriage of justice (i.e., a constitutional error has probably resulted in the conviction of someone who is actually innocent)." *Ponder v. Conway*, 748 F. Supp. 2d 183, 188 (W.D.N.Y. 2010) (citing *Coleman*, 501 U.S. at 750).

The "prejudice" requirement involves not just a showing of a possibility of prejudice, but a showing that the alleged errors worked to petitioner's "actual and substantial disadvantage." *United States v. Frady*, 456 U.S. 152, 170 (1982). Thus, petitioner's claim regarding application of § 60.22(1) to the first degree murder charges is prejudicial only if the claim is meritorious.

*See Cappiello v. Hoke*, 698 F. Supp. 1042, 1052 (E.D.N.Y. 1998); *see generally Gomez v. Brown,* 655 F. Supp. 2d 332 (S.D.N.Y. 2009).

Pursuant to the relevant part of New York Penal Law ("NYPL") § 125.27(1)(a)(vii), a person is guilty of murder in the first degree when "[w]ith intent to cause the death of another person, he causes the death of such person or of a third person"; and was in the course of committing or attempting to commit another named crime, unless the "defendant's criminal liability . . . is based upon the defendant having commanded another person to cause the death of the victim pursuant to section 20.00 of this chapter." Petitioner's criminal liability was, however, based upon his, and not "another person's" conduct, and thus, imposition of liability under this subparagraph did not require the prosecution to prove that petitioner "commanded" his co-defendants to kill the victims. Consequently, petitioner's claim that his due process rights were violated by the application of § 60.22(1) to the first degree murder counts is nonmeritorious.

Furthermore, the corroborative evidence did not "merely tend to connect" petitioner to the alleged crimes; its purpose was to prevent the jury from relying exclusively on accomplice testimony in finding petitioner guilty of the charged crimes. Nor did its application foreclose petitioner from asserting any affirmative defenses and, accordingly, this argument is likewise nonmeritorious. Because petitioner has not established prejudice, this claim is dismissed as procedurally defaulted.

### 6. Ineffective Assistance of Trial Counsel

The Sixth Amendment of the Constitution provides: "In all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defence." U.S. Const. amend. VI.

"The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." *Strickland v. Washington,* 466 U.S. 668, 691-92 (1984). "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687-88. Furthermore, "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Id.* at 692. A "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In evaluating an ineffective assistance claim, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and a defendant bears the burden of overcoming the presumption that counsel's decisions were sound. *Id.* at 689. Accordingly, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.*

To prevail under *Strickland*, petitioner must demonstrate that his attorney's performance prejudiced him because the representation fell below an objective standard of reasonableness. Prejudice is established by showing that but for counsel's incompetent assistance, the proceeding would have turned out differently. Furthermore, petitioner must also show that the hearing court's decisions with respect to his ineffective assistance of counsel claims were contrary to, or involved an unreasonable application of *Strickland* or that the decisions involved an unreasonable application of the law based upon the evidence presented.

Petitioner raises the same arguments in support of this claim as his appellate counsel raised on direct appeal, to wit: (1) defense counsel, Henry O'Brien, Esq., without explanation,

failed to have Ricardo Joseph's letter and affidavit, wherein he took sole responsibility for the crimes, admitted into evidence; (2) defense counsel admitted his lack of effectiveness when he informed the trial court that he could not effectively cross-examine Paulene Toussaint; and (3) counsel met with petitioner for the first time only one (1) day prior to his *Huntley*[10] hearing. The Appellate Division held that petitioner received the effective assistance of counsel. *Toussaint*, 902 N.Y.S.2d at 167.

During his plea allocution, when asked whether he could explain why he previously accepted responsibility for the murders, Joseph responded "not really." Upon a private discussion with his attorney, Joseph voluntarily stated that he was pressured by petitioner to take the blame. Therefore, according to petitioner, it can be inferred that Joseph repudiated the statement after his attorney advised him that he would not receive the same deal if he failed to testify that he was pressured to accept responsibility. In reaching their guilty verdicts, however, the jury had to find that Paulene's accomplice testimony, i.e., that petitioner committed the murders, was corroborated by other evidence in the record. Conversely, with respect to the statements and as the trial and appellate courts held, "there was no independent supporting proof indicating that the statements were trustworthy and reliable." *Toussaint*, 902 N.Y.S.2d at 166. Thus, the fact that the statements were not admitted does not demonstrate ineffective assistance.

Petitioner claims that his defense attorney "admitted" his lack of effectiveness when he advised the trial court that he could not effectively cross-examine Paulene.[11] In actuality,

---

[10] *People v. Huntley*, 204 N.E.2d 179 (N.Y. 1965).

[11] Mr. O'Brien actually stated: "I'm asking for a continuation. I'm getting tired. I would like to start reviewing my material. I can't finish my cross-examination effectively now." Tr.

petitioner's trial counsel asked for an continuation at 4:45 p.m. on the day Paulene testified to review his notes and because he was exhausted. Tr. 696-97. However, once the trial court denied his request, the record shows that Mr. O'Brien effectively cross-examined Paulene (*see* tr. 696-756).

With respect to petitioner's argument that he first met Mr. O'Brien one (1) day before his *Huntley* hearing, the record reflects that the hearing took place over the course of three (3) dates with more than one (1) week between the first and last hearing. In addition, there are no deficiencies in the record and petitioner does not specifically identify any. Therefore, trial counsel's representation was effective and this claim is dismissed.

### 7.    The Trial Court's Conduct

Petitioner alleges that although the trial judge did not interrupt the prosecution's direct examination of its witnesses, he repeatedly interrupted defense counsel's cross-examination, thereby bolstering the credibility of the prosecution's witnesses and leading the jury to believe that defense counsel did something improper requiring the trial judge's intervention. Pet. p. 27. For example, during defense counsel's impeachment of witness Timothy McGlurk's[12] testimony, the trial judge stated that although defense counsel's cross-examination as to inconsistencies between McGlurk's statement to the police and his statement in court was permissible, he had previously heard the testimony and looked at the statement and found no inconsistencies. *Id.* at 27-28. During direct examination of one of the detectives, when defense counsel objected

---

696.

[12]    McGlurk was in the vehicle stolen by petitioner right after the murders.

numerous times on hearsay grounds and relevancy, the trial judge stated, in front of the jury:

"Well, you think it's not but I guess I want to paint with a little broader brush than you do, so that's the way we'll do it." *Id.* at 28. The trial court allegedly mocked defense counsel while he cross-examined the arson expert. *Id.* During the cross-examination of accomplice witness Paulene Toussaint, the question arose as to the number of statements she made and the court stated that it would depend on the prosecutor and "trusts his word on it."[13] *Id.*

On appeal, the appellate division held that the "trial court's rulings, its questioning of witnesses during direct and cross-examination, and its occasional admonitions to the [petitioner's] trial counsel did not exhibit bias" and "[w]hile some of the trial court's comments might have been better left unsaid, they do not warrant reversal." *Toussaint*, 902 N.Y.S.2d at 167.

A "trial is not rendered constitutionally unfair every time a trial judge asks a question obviously intended to permit a witness to emphasize testimony helpful to the prosecution or clearly designed to challenge testimony favorable to the defense." *Daye v. Attorney Gen. of State of N.Y.*, 712 F.2d 1566, 1572 (2d Cir. 1983). Rather, a "trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a substantial degree before the risk of either impaired functioning of the jury or lack of the appearance of a neutral judge conducting a fair trial exceeded constitutional limits." *Id.* Thus, the Second Circuit Court of Appeals has stated that 'it is abundantly clear that only infrequently does intervention by a trial judge rise to the level of a due process violation," *Jones v. Donnelly*,

---

[13] The petition contains additional instances of the trial court's bias, all of which were considered. Pet. pp. 28-34.

487 F. Supp. 2d 403, 410 (S.D.N.Y. 2007) (citing *Gayle v. Scully*, 779 F.2d 802, 806 (2d Cir. 1985)), and therefore, and "a petitioner claiming that a judge's bias deprived him of a fair trial faces a difficult task, *Gayle*, 779 F.2d at 806. The Second Circuit has held that a trial court's explicit expression to a jury that a defendant is guilty would be adverse to the defendant to a substantial degree. *Id.*

As the Appellate Division held, although some of the trial judge's statements were better left unsaid, petitioner does not claim that the judge expressly told the jury that he was guilty. Consequently, petitioner has not demonstrated that the court's intervention during the trial was adverse to a substantial degree and this claim is dismissed. *See id.* (holding that trial court's intervention was not substantially adverse where trial judge frequently made statements which could be described as caustic, sarcastic, gratuitous and were better left unsaid); *Johnson v. Scully*, 727 F.2d 222, 227 (2d Cir. 1984) (holding that although the judge's intervention in the trial was "far more extensive than what is normally appropriate for a trial judge" and there were instances of pro-prosecution questioning and comment, the defendant's due process rights were not violated).

## 8.     The Evidence Before the Grand Jury on the Arson Charge

Petitioner alleges that the evidence presented to the grand jury was insufficient to support the arson charge because the assistant district attorney did not present evidence of each element of the crime. On appeal, the court held that this claim was unreviewable because the "judgment of conviction with respect to [the arson] charge was based upon legally sufficient trial evidence." *Toussaint*, 902 N.Y.S.2d at 167.

"[F]or federal constitutional purposes, a jury conviction transforms any defect in the grand jury's charging decision into harmless error because the trial conviction establishes probable cause to indict and also proof of guilt beyond a reasonable doubt." *Nappi v. Yellach*, No. 12 Civ. 1193, 2014 WL 2434805, at *11 (N.D.N.Y. May 30, 2014). *See United States v. Mechanik*, 475 U.S. 66, 67 (1986) ("[T]he petit jury's verdict of guilty beyond a reasonable doubt demonstrates *a fortiori* that there was probable cause to charge the defendants with the offenses for which they were convicted. Therefore, the convictions must stand despite the [grand jury] rule violation."). Based upon the jury's guilty verdict at trial, any alleged defect in the grand jury's charging decision was harmless error and this claim is dismissed.

### 9. Petitioner's Sentence

Petitioner alleges that prior to his pretrial suppression hearing, the trial court attempted to convince him to take a plea and receive a sentence of forty (40) years to life. He argues that he was punished for not accepting the plea and for exercising his right to a jury trial. Pet. p. 35.

However, "[i]t is well established that generally when a sentence falls within the range prescribed by state law, the length of the sentence may not be raised as a basis for federal habeas relief." *Melendez v. LaValley*, 942 F. Supp. 2d 419, 424 (S.D.N.Y. 2013). *See White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law.") (citing *Underwood v. Kelly*, 692 F. Supp. 146, 152 (E.D.N.Y. 1988), *aff'd mem.*, 875 F.2d 857 (2d Cir. 1989)). Thus, when a sentence is within this range, "a claim of excessive punishment does not present a constitutional question necessary for habeas corpus reversal." *Underwood*, 692 F. Supp. at 152. It is undisputed that petitioner's sentence fell within New York's sentencing guidelines.

In addition, petitioner offers nothing but speculation in support of his claim that his sentence was a punishment for exercising his right to trial and for these reasons, this claim is dismissed.

### 10. Petitioner's Arrest

On or about December 5, 2011, petitioner filed a motion to vacate his judgment of conviction pursuant to CPL § 440.10 in the County Court, Suffolk County, alleging: (1) that his arrest was the result of an unlawful search and seizure; and (2) ineffective assistance of counsel based upon his attorney's failure to raise this issue. By decision dated January 9, 2012, the trial court denied the motion, holding that the contentions raised were devoid of merit and procedurally barred. Petitioner sought leave to appeal to the Appellate Division, which was denied on May 31, 2012.

As discussed above, a federal habeas court "will address the merits of a procedurally barred claim only if there is a showing of cause why the claim was defaulted, and a showing of prejudice to the Petitioner." *Johnson v. State of N.Y.*, 974 F. Supp. 185, 188 (E.D.N.Y. 1997). To establish prejudice, petitioner must demonstrate that his claim is meritorious.

In his CPL § 440.10 motion to vacate his judgment of conviction, petitioner argued that his arrest by law enforcement at the Third Precinct in Bay Shore, where he had gone to post bail for Ricardo Joseph, was without probable cause and that his statement to police should be suppressed. During the suppression hearing,[14] Detective Samuel DeJesus ("DeJesus") testified that Detective-Sergeant Doyle directed him to go to the precinct, meet with Detective Reilly and place petitioner under arrest if he appeared at the precinct. Suppression Hearing ("SH") 13.

---

[14] Petitioner first raised the probable cause issue in his § 440.10 motion.

-27-

After Detective Reilly observed petitioner in the precinct lobby, DeJesus placed him under arrest. *Id.* at 14-15. DeJesus testified that he was unaware of the basis for petitioner's arrest and was following Detective-Sergeant Doyle's orders. *Id.* at 26.

Petitioner argues that DeJesus did not have probable cause to arrest him. In New York, however, under the "fellow officer rule," a "police officer can make a lawful arrest even without personal knowledge sufficient to establish probable cause, so long as the officer is acting upon the direction of or as a result of communication with a fellow officer in possession of information sufficient to constitute probable cause to make the arrest." *Mobley v. Kirkpatrick*, 778 F. Supp. 2d 291, 300 n.1 (W.D.N.Y. 2011). Trial testimony by Detective Mercer demonstrates that prior to petitioner's arrest, police had Joseph in custody and he had implicated petitioner in the murders, giving the officers probable cause to arrest petitioner. Tr. 1003, 1007-1008.

Based upon the foregoing, petitioner's claim that he was arrested without probable cause is nonmeritorious and therefore, he cannot establish prejudice and the claim is dismissed. Furthermore, petitioner's eleventh claim alleging that defense counsel was ineffective for failing to raise this claim is likewise dismissed.

## III.    Conclusion

For the reasons set forth above, the petition for a writ of habeas corpus is **DENIED** and the proceeding is dismissed in its entirety. As petitioner has failed to make a substantial showing of the violation of a constitutional right, a certificate of appealability shall not issue. 28 U.S.C. § 2253(c)(1); *see also Miller –El v. Cockrell*, 537 U.S. 322, 336 (2003); *Contino v. United States*, 535 F.3d 124, 127 (2d Cir. 2008). Petitioner has the right to seek a certificate of appealability from the United States Court of Appeals for the Second Circuit. *See* 28 U.S.C. § 2253.

The Clerk of the Court shall enter judgment in favor of respondent, close this proceeding and serve notices of entry of this Order on all parties in accordance with Rule 77(d)(1) of the Federal Rules of Civil Procedure, including mailing a copy of the Order to petitioner at his last known address.

**SO ORDERED**.

Dated: June 5, 2015
      Central Islip, New York

_____
/s/
Sandra J. Feuerstein, U.S.D.J.
